# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JOHN D. HODGES**
    **Plaintiff,**

  **v.**           **Case No. 18-C-1129**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
      **Defendant.**

---

## DECISION AND ORDER

    Plaintiff John Hodges seeks judicial review of the denial of his application for social security disability benefits. Plaintiff contends that the Administrative Law Judge ("ALJ") assigned to the case erred in evaluating the opinions of the agency medical and psychological consultants, his statements regarding the severity of his symptoms, and his alleged mental impairments. He further contends that the ALJ should have required the vocational expert ("VE") who testified at his hearing to disclose the materials upon which she relied in forming her opinions. As plaintiff acknowledges in a supplemental submission (R. 19), his VE claim is undermined by the Supreme Court's recent decision in <u>Biestek v. Berryhill</u>, which rejected the Seventh Circuit's categorical rule that such materials must be made available on demand. 139 S. Ct. 1148, 1153-54 (2019) (citing <u>McKinnie v. Barnhart</u>, 368 F. 3d 907, 910-911 (7th Cir. 2004)). While <u>Biestek</u> permits such challenges on a case-by-case basis, <u>see, e.g.</u>, <u>Krell v. Saul</u>, 931 F.3d 582, 587 (7th Cir. 2019), because this matter must be remanded for reconsideration of plaintiff's statements and mental impairments (which may result in a different residual functional capacity, thus requiring new vocational evidence), I need not engage in that analysis.

## I.  FACTS AND BACKGROUND

### A.    Plaintiff's Application and Agency Decisions

Plaintiff filed the instant application for benefits in May 2015, alleging a disability onset date of January 11, 2014.[1]  (Tr. at 53, 220.)  He indicated that he could no longer work due to a cervical spinal fusion, headaches, and carpal tunnel syndrome.  (Tr. at 251.)  In a function report, plaintiff stated that he could sit for one hour before he needed to move around, stand for one hour before needing to rest or sit down, and walk for five minutes before needing to rest.  He further indicated that he could lift 10 pounds consistently, 15 occasionally, from the floor to his waist, but could not lift items above his head.  He also indicated that his limited stamina affected his ability to work a full day, and that he would miss work at least one day per week due to pain/migraines.  (Tr. at 269.)  Finally, he indicated that his conditions affected his memory, concentration, and ability to complete tasks.  (Tr. at 272.)  He took the medications Oxycodone and Oxycontin, which caused side effects including constipation, dizziness, headache, and mood changes.  (Tr. at 273.)

The agency sent plaintiff for an internal medicine exam with Daryl Melzer, M.D., on August 20, 2015.  Plaintiff reported that he injured his neck in 2006 when a hitch fell while he was working on a car.  He underwent neck surgery in 2009, which improved the left arm weakness caused by his injury, but he continued to experience neck pain radiating down both arms.  He also reported a tendency to drop things.  He further complained of carpal tunnel

_____

[1]The onset date is tied to the date of a previous denial, effective January 10, 2014.  (Tr. at 117.)  Plaintiff stopped working in January 2011 (Tr. at 251), so he remained "insured" for purposes of disability insurance benefits only through December 31, 2015.  (Tr. at 56.) Accordingly, he must demonstrate disability between January 11, 2014, and December 31, 2015, to receive benefits.

syndrome and chronic headaches. (Tr. at 386.) Plaintiff stated that he used to be a heavy drinker (although he drank minimally now), and records revealed a hospital admission for alcohol withdrawal symptoms and alcoholic hepatitis in January 2015. On review of systems, plaintiff reported depression related to his medical issues. On exam, his neck was very tight, with tenderness and quite a bit of muscle spasm and limited range of motion. His low back was unremarkable. (Tr. at 387.) Neurologically, he had absent reflexes; grip strength was normal, but slightly weaker on the left than the right; and he had decreased sensation. (Tr. at 387-88.) He had positive Phalen's bilaterally and positive Tinel on the left, suggesting carpal tunnel syndrome.[2] Biceps and triceps strength were in the normal range, and gait and station were normal. Dr. Melzer's impression was (1) history of cervical fusion, with left arm weakness resolved, but chronic pain and some residual sensory deficits; (2) bilateral carpal tunnel syndrome, more prominent on the left, but difficult to separate from his cervical issues; (3) headaches, most likely related to the muscle spasms in his neck; and (4) a history of alcohol abuse, resolved over the last several months. (Tr. at 388.)

The agency also sent plaintiff for a psychological evaluation with Robert Verwert, Ph.D., on October 20, 2015. (Tr. at 391.) Asked what prevented him from working, plaintiff responded neck pain with headaches, pain shooting down both arms and hands, and difficulty sleeping. Some days he did not get out of bed because he was so depressed. (Tr. at 391.) He indicated that the depression started after his surgery in 2009. He had never seen a psychiatrist, although he did talk to his primary physician, who declined to prescribe anti-depressants due to worry about drug interactions with his pain medications. Plaintiff also

_____

[2]https://www.webmd.com/pain-management/carpal-tunnel/carpal-tunnel-diagnosis#1.

reported a history of heavy drinking, with a detox admission in January 2015. He indicated that his brother recently closed his auto body shop, and he helped his brother move out, lifting things he should not have. He admitted drinking after that, and early in the afternoon of this appointment, although he was trying to wean himself. (Tr. at 392.) He indicated that he did not go out much, staying home with ice around his neck due to pain. (Tr. at 393-93.) He indicated that, on a typical day, he did not "do a whole lot. I shower, eat, and watch TV. I forget to turn the stove off and I forget things a lot." (Tr. at 393.) His wife did all the cooking, cleaning, and grocery shopping. On mental status exam, he presented appropriately, in no acute psychiatric distress. He did have to get up for relief from sitting, which aggravated his back. (Tr. at 393.) He was alert, responsive, and cooperative during the interview. His affect was appropriate, normal in range, and stable. He was talkative and his speech was clear and lively. His attention and concentration abilities were sufficient, as he could do simple computations, but he had trouble with serial 7 subtraction. He did seem capable of abstract thought and his fund of knowledge was adequate. His social judgment appeared to be good, his short-term memory was intact, and his thoughts coherent and goal-directed. (Tr. at 394.)

Dr. Verwert also conducted a collateral interview with plaintiff's wife, and she reported that plaintiff had trouble sleeping, "gets depressed and he doesn't function." (Tr. at 394.) She further reported that he "cannot sit still," "cannot keep attention in a conversation," "gets upset and moody," and "his memory is not good," e.g., he left the oven and stove on. (Tr. at 394.)

Dr. Verwert diagnosed depression due to other medical condition/chronic pain, and alcohol use disorder, moderate, with a GAF of 50 ("serious symptoms mainly due to chronic

pain").[3]  (Tr. at 395.)  He concluded:

> Due to the pain and to his poor memory, as his wife attests, as well as due to his depression, he would have trouble in all areas.  It will be difficult for him to remember and carry out instructions.  It would then be difficult for him to get along appropriately with supervisors and coworkers.   His attention and concentration abilities are weak and therefore difficult to keep up with work pace or work stresses or adapt to changes.

(Tr. at 395.)

The agency denied plaintiff's application initially on November 11, 2015 (Tr. at 100, 136) and on reconsideration on May 23, 2016 (Tr. at 115, 145), relying on the opinions of medical and psychological reviewing consultants that plaintiff could despite his severe physical and mental impairments perform a range of light, unskilled work.   Specifically, the medical reviewers, Drs. Mina Khorshidi and George Walcott, found plaintiff capable of light work, with occasional climbing of ladders, ropes, and scaffolds, and frequent (but not constant) fingering with both hands.  (Tr. at 109-10, 125-26.)  The psychological reviewers, Drs. Esther Lefevre and Stacey Fiore, found mild restriction of activities of daily living and social functioning, but moderate difficulty in maintaining concentration, persistence, or pace.  (Tr. at 107, 123.)  They further endorsed moderate limitations in understanding and carrying out detailed instructions, maintaining attention and concentration for extended periods, performing at a consistent pace without an unreasonable number of rest periods, and responding appropriately to changes in the work setting.  (Tr. at 111-12, 127-28.)  They nevertheless found plaintiff capable of unskilled work (Tr. at 113, 129), with Dr. Fiore explaining: "Based on the totality of the objective and

---

[3]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and his overall level of functioning.  Set up on a 0-100 scale, scores of 51-60 reflect "moderate" symptoms and 41-50 "severe" symptoms.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

subjective evidence in file and considering the mental impairments only, the claimant is able to persist at simple tasks over time under ordinary conditions." (Tr. at 128.)

Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 156.) Prior to the hearing, plaintiff filed a request for a subpoena duces tecum and an objection to the testimony of the VE noticed for the hearing. (Tr. at 318.) In that request, plaintiff sought production of the documents upon which the VE would rely in forming her opinions. (Tr. at 318.) Plaintiff further objected to the VE's competency to offer opinions on numbers of jobs, as it did not appear she had any qualifications as a labor market statistician. (Tr. at 319.)

The ALJ denied plaintiff's request, stating that it did not specify the important facts that the documents were expected to establish or that the information could not be obtained through testimony. (Tr. at 214.) The ALJ also found it premature to address plaintiff's objection to the VE's testimony, as such testimony would only be offered if the case reached step five of the sequential evaluation process. (Tr. at 214-15.) "Additionally, the Social Security Administration has found this individual qualified as a vocational expert by entering into a contract for professional services that requires a designated level of expertise." (Tr. at 215.) The ALJ further stated that the VE could, at the hearing, respond to questions regarding her background sources. He therefore denied the request to issue a subpoena. (Tr. at 215.)

## B.    Hearing Testimony

On September 7, 2017, plaintiff appeared with counsel for a video hearing before the ALJ. The VE appeared telephonically. (Tr. at 70-71.)

### 1.    Plaintiff

Plaintiff testified that in 2014-15 he experienced migraine headaches every couple

weeks, more often now, lasting eight hours to two days. (Tr. at 74-75.) These headaches were debilitating, such that he could barely get out of bed to use the bathroom. (Tr. at 75.) Plaintiff further testified that he experienced problems with anxiety and depression during this time, although he did not then seek treatment as he was in denial about the need for it. (Tr. at 76.)

Plaintiff testified that he missed many family gatherings and events due to pain from migraines or his neck. He would sit with ice on his neck, if not sleeping. (Tr. at 76.) He indicated that pain interfered with his ability to sleep at night, leaving him feeling fatigued the next day, which in turn caused problems with concentration and memory. (Tr. at 77.)

Plaintiff further testified that he experienced numbness in his arms and hands, which caused him to drop things, as well as shooting pains down the arms. His hands were always numb to some degree, although the severity varied from day to day. (Tr. at 78.) Every week or week and a half the numbness would become so severe he could not pick up anything. (Tr at 79.)

Plaintiff stated that he could stand for 10-15 minutes before he had to sit and sit for 30-45 minutes before had to change positions. (Tr. at 79-80.) He could not walk very far without getting pain in his neck from the vibrations of walking. He testified that the exertion of getting to the hearing would cause him "to be shot" for the next two or three days. (Tr. at 80.)

The ALJ asked about a notation in the record that plaintiff helped at his brother's auto body shop, and plaintiff explained that he just visited and did no work. (Tr. at 81-82.) Plaintiff reported past work as an auto body worker/painter; he attempted to continue working after his injury but was unable to do so, even in the office and even with reduced hours; he started missing work and was let go. (Tr. at 83-84.)

7

**2.	VE**

The VE characterized plaintiff's past work as auto body worker, medium generally, very heavy as performed.  (Tr. at 87.)  The ALJ then asked a hypothetical question, assuming a person capable of light work, occasionally climbing ladders, ropes, or scaffolds, and frequently fingering objects bilaterally.  (Tr. at 87.)  The VE testified that such a person could not do plaintiff's past work but could do other jobs such as cleaner/housekeeping, 40,000-50,000 jobs nationally; cashier II, 150,000-200,000 jobs nationally; and marker, 25,000-35,000 jobs nationally.  (Tr. at 88.)  Reducing the exertional level to sedentary, the person could work as an order clerk (30,000-40,000 jobs), charge account clerk (40,000-50,000 jobs), and food checker (15,000-20,000 jobs).  (Tr. at 88-89.)

The VE testified that a person could not be off task more than 15% of the day and maintain competitive employment, or miss more than one day of work per month.  (Tr. at 89.) The VE indicated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), aside from the questions about off task time and absences, which she based on her training and experience.  (Tr. at 90.)

Asked what publications she relied on in giving her testimony, the VE responded: "A combination of the Dictionary of Occupational Titles, classifications of jobs, the ONET, professional publications, the SkillTRAN, as well as independent labor market surveys with the – well.  The research with BLS and also independent labor market surveys that are performed within my private practice."  (Tr. at 90.)  She indicated that the only non-public information would be the labor market surveys she had done.  (Tr. at 90.)  Asked to describe how she had used those surveys, the VE said:

The labor market surveys primarily would be related to having a knowledge base

8

and understanding of how the jobs are performed and the skill level. And then the other part of that would be just to kind of reconfirm the jobs and their existence. Meaning through the labor market surveys on those jobs and then also doing additional research to comport that the numbers are accurate.

(Tr. at 90-91.)

Asked how she came up with the job numbers, the VE said: "I primarily used the SkillTRAN [INAUDIBLE] along with just independent research that I do that I've already discussed. And looking at the OES numbers. And then comparing that to the DOT numbers. And then coming up with a range of numbers related to the published information." (Tr. at 91.)

The ALJ asked plaintiff's counsel if he wanted to review the labor market surveys, and counsel said he did. The ALJ indicated those materials would be available at the field office at a reasonable time. (Tr. at 91.) On questioning by counsel, the VE testified that she had not since she started doing this work in 1998 been asked to submit her survey materials. (Tr. at 93.)

Counsel then asked further questions about the VE's methods. She indicated that she started with SkillTRAN. (Tr. at 93.) Asked if that source was freely available online, the VE said the computerized program cost money "but as far as the methodology and all that information, that's public knowledge." (Tr. at 93-94.) She indicated this information was available online but seemed unsure of the format. Asked if they "lay out their methodology in a way that results can actually be replicated," the VE said: "I'm not sure about that." (Tr. at 94.)

Counsel further inquired about SkillTRAN, and the VE confirmed that you punch in certain criteria and it gives you a number of jobs associated with a certain DOT code. (Tr. at 95.) Asked what is done with the number produced by SkillTRAN, she said:

Basically looked at that number, compared it to the national number requested directly through the DOT. And then based on my experience in analyzing those

9

jobs and looking at job openings and surveying the market, that – it just basically supports my understanding of that work. Whether it's increasing in number, declining, what the status of that specific occupation is doing.

(Tr. at 95-96.) Regarding one of the identified jobs, counsel asked: "So did you find any job openings for food checkers as the job is described in the DOT?" (Tr. at 96.) The VE responded: "Not recently." (Tr. at 96.) Finally, counsel asked, "Does the census bureau or some other part of the government publish job numbers broken down by DOT code?" The VE said: "No." (Tr. at 96.)

The ALJ then requested clarification on the VE's surveys. (Tr. at 96.) The VE said:

My labor market surveys are basically when I am working with an individual and going out and assessing the jobs. So it wouldn't be specific jobs. The other thing is many times I'm pulled in to consult on cases where the individual is injured and we're trying to evaluate whether he can go back to his original job or whether other jobs with that employer exist. So that's when I would go in and actually do the job type analysis and basically have the foundation and understanding of what's required of jobs.

(Tr. at 97.)

The ALJ asked if, for any of the jobs she provided at that hearing, the VE relied on her labor market surveys. She responded:

Not that much. I think the labor market surveys that I was relying on really had more to do with the understanding of how these jobs are performed as opposed to kind of coming up with certain numbers. But what I would say is I'm actively in private practice and evaluate clients, that I do have a good foundation and understanding of the growth trends of occupations and which ones are in a growth mode and which ones are declining.

(Tr. at 97.)

The ALJ concluded the hearing by stating: "I will look into the labor market survey. We'll contact [the VE] and see what needs to be done there." (Tr. at 98.) Following the hearing, plaintiff renewed in writing his request for the VE's labor market surveys. (Tr. at 352.)

10

**C.    ALJ's Decision**

On October 18, 2017, the ALJ issued an unfavorable decision.  (Tr. at 50.)  Following the familiar five-step evaluation process, see 20 C.F.R. § 404.1520(a)(4), the ALJ determined (1) that plaintiff did not engage in substantial gainful activity from the alleged onset date of January 11, 2014, through his date last insured of December 31, 2015; (2) that he suffered from the severe impairments of a cervical spine condition and bilateral carpal tunnel syndrome (Tr. at 56); (3) that none of his impairments qualified as conclusively disabling under the agency's regulations (Tr. at 58); (4) that he was limited to light work involving only occasional climbing of ladders, ropes, and scaffolds, and frequent fingering with the bilateral upper extremities, which prevented him from performing his past relevant work (Tr. at 58-62); but (5) that he could perform other jobs, as identified by the VE, including cleaner/housekeeper, cashier, and marker (Tr. at 62-63).

**1.    Step Two**

At step two, the ALJ determined that plaintiff's headaches did not constitute a separate, medically determinable impairment.  The ALJ noted that the consultative examiner indicated the headaches were likely related to the neck impairment, no neurological work-up or treatment for headaches had been undertaken, and no headache-related clinical signs were observed at treatment visits.  (Tr. at 56.)

The ALJ further determined that plaintiff's mental impairments of depression and alcohol use disorder caused no more than minimal limitation in plaintiff's ability to perform basic mental work activities.  The ALJ acknowledged that the consultative psychological examiner diagnosed depression due to other medical condition of chronic pain and alcohol use disorder, moderate

and that plaintiff had one hospital visit prior to the date last insured for acute alcohol withdrawal. However, aside from some issues with a serial 7 activity, during which plaintiff explained that he had always been bad with numbers, plaintiff's mental status was intact on examination: attention and concentration were sufficient, he seemed capable of abstract thought, his fund of knowledge was adequate, he exhibited insight into his condition, his social judgment seemed to be good, he was fully oriented, his short-term memory was intact, and his thoughts were coherent and goal-directed. He received no treatment for mental illness during the relevant period. (Tr. at 56.) While he did receive such treatment in September 2016, following a June 2016 emergency visit for alcohol intoxication and withdrawal symptoms, his symptoms improved significantly in a short period of time. (Tr. at 56-57.) Thus, while the ALJ found this evidence sufficient to establish medically determinable impairments, the lack of relevant signs or treatment prior to the date last insured was inconsistent with a finding of significant symptoms or functional limitations. (Tr. at 57.)

The ALJ also considered the four broad functional areas set out in the regulations: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Plaintiff reported problems with depression and anxiety in 2014 and 2015, but he did not specifically identify any functional limitations caused by his mental conditions and instead attributed his work-related limitations primarily to his neck pain and headaches. The ALJ found that the diagnostic information and later treatment notes, combined with plaintiff's wife's statements regarding his moodiness, social withdrawal, and difficulty following a conversation, supported some limitation under these criteria, but "more than mild limitation in any of the areas is not supported due to the lack of significant clinical findings or treatment during the relevant period, the lack of specificity in the

12

claimant's own statements regarding his mental health, and the relative significance of the claimant's physical impairments on his functional level according to his own statements and the consultative psychological examiner's diagnostic impression." (Tr. at 57.)

In finding the mental impairments non-severe, the ALJ gave little weight to the opinions of the consultative psychological examiner and the agency psychological consultants. Since plaintiff had never been treated for mental impairments, "the consultative examiner's assessment of more than minimal limitations appears to have been based entirely on subjective statements by the claimant and his wife without significant corroboration in the medical evidence." (Tr. at 57.) In assigning a GAF score, the examiner noted that plaintiff's physical symptoms were taken into account, along with his mental impairments. The state agency consultants, in turn, relied on the consultative examination. In contrast to these sources' assessments, the remaining medical evidence, including the records obtained at the hearing level pertaining to the post-date last insured period, were reflective of treatable, minimally impactful mental conditions. (Tr. at 58.) The ALJ also gave little weight to plaintiff's wife's statements during the collateral interview with the psychological consultant. While she described symptoms of depression, social withdrawal, fidgeting, and difficulty following a conversation, "the weight of the evidence, particularly the lack of clinical support and treatment, suggests these concerns were relatively minor in terms of their functional effect." (Tr. at 58.) The ALJ also found her statement that plaintiff's memory was not good in conflict with clinical findings by plaintiff's primary provider and the consultative examiner. (Tr. at 58.)

**2.     RFC**

In determining RFC, the ALJ considered plaintiff's statements regarding the severity of his symptoms and the medical opinion evidence.

13

### a.    Symptoms

Regarding the symptoms, the ALJ acknowledged the required two-step evaluation process, under which he first had to determine whether plaintiff suffered from impairments that could reasonably be expected to produce the alleged symptoms; once such impairments had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of the symptoms.  At this second step, if the statements were not substantiated by the objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the statements limited the ability to do work-related activities.  (Tr. at 59.)

Plaintiff alleged disability due to chronic neck pain, headaches, and carpal tunnel syndrome.  He alleged that the pain interfered with his sleep; that to compensate for neck pain he put added pressure on his lower back; and that his carpal tunnel caused him to experience shooting pain and numbness, and to drop things.  He stated that he could stand for just 10-15 minutes and sit 30-45 minutes at a time, needing to change positions because of neck pain, low back discomfort, and fatigue.  He testified that he tried to work full-time, but it was too hard on his body and neck.  (Tr. at 59.)

The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. at 59.)

The ALJ agreed that significant exertional, postural, and environmental limitations were supported by the diagnostic and treatment notes, but not to the degree alleged.  Plaintiff

14

suffered a neck injury in 2006, undergoing cervical spinal fusion surgery in May 2009. (Tr. at 59.) Other treatment prior to the alleged onset date included cervical epidural steroid injections, which were ineffective. (Tr. at 59-60.) Testing also revealed carpal tunnel syndrome, mild on the left and moderate on the right. During the relevant period, plaintiff continued to complain of neck pain, numbness, and tingling in his arms, causing him to drop things, with less than normal strength in his left arm. August 2015 x-rays showed the prior C5-C7 fusion as well as degenerative changes in the lower cervical spine. He exhibited clinical abnormalities including muscle spasm, restricted cervical range of motion, absent reflexes, weaker left grip strength, and decreased sensation. Treatment during the relevant period included narcotic pain medications provided by a pain specialist. The ALJ concluded: "Under these facts, given the testimony and allegations, restriction to a range of light work with limitations to occasional climbing of ladders, ropes, or scaffolds and frequent use of the hands for fingering is supported." (Tr. at 60.)

"However, further alleged limitations are not warranted in this case, in light of the course of treatment, some of the objective evidence, and some of the claimant's statements about symptoms to providers." (Tr. at 60.) The ALJ concluded that plaintiff's treatment during the relevant period was "conservative and routine," with no further surgery recommended. The consultative physical examiner found that plaintiff's upper extremity strength was essentially intact; his gait and station were normal; and no abnormality of the lower back was observed. (Tr. at 60.) Finally, while plaintiff described debilitating physical symptoms during the consultative exams, he generally told providers that his symptoms were well controlled. (Tr. at 60-61.)

### b.    Opinion Evidence

The ALJ gave great weight to the agency medical consultants,

> acceptable medical sources, familiar with the disability standards, whose opinions were based in their review of the available medical and nonmedical evidence. Their findings are consistent with the claimant's surgical history as well as the diagnostic and treatment notes, as discussed above. Nothing in the evidence received at the hearing level is in particular conflict with their conclusions. For these reasons, these opinions are given great weight in this case.

(Tr. at 61.)  The consultative physical examiner did not assess plaintiff's functional capacity, but the psychological examiner did comment on plaintiff's pain and related limitations.  "As the claimant's physical conditions were not within this examiner's specialization, the conclusions were not based on physical examination but on statements made by the claimant and his wife, and the conclusions were inconsistent with the weight of the remaining medical and other evidence for the reasons discussed above[.]" (Tr. at 61.)  The ALJ likewise gave little weight to plaintiff's wife's statements, which largely overlapped with plaintiff's testimony at the hearing.  "For the same reasons discussed above with respect to the claimant's allegations, thus, the claimant's wife's opinion is not entirely consistent with the medical and other evidence."  (Tr. at 61.)

### 3.    Step Five/VE Testimony

Based on the RFC presented by the ALJ, the VE identified the following jobs: cleaner/housekeeper (40,000-50,000 jobs in the national economy), cashier (150,000-200,000 jobs), and marker (25,000-35,000 jobs).  (Tr. at 63.)  Based on questioning by plaintiff's lawyer, the VE indicated that her testimony was based in part on private labor market surveys she had conducted.  At the time, the ALJ indicated that plaintiff's request for such private materials was

16

well taken.

However, upon review of the testimony, it does not appear the vocational expert relied on private labor market surveys specifically either in identifying the above occupations as consistent with the claimant's medical-vocational profile or in assessing the number of jobs in each occupation existing in the national economy. Rather, the testimony suggests, the labor market surveys generally informed her knowledge base and qualifications as a vocational expert. As such, the request is denied because analysis of the materials to be subpoenaed would be unlikely to result in production of material information or affect the reliability of the vocational testimony.

The decisive question concerning the merits of this subpoena request is whether production of the job market surveys alluded to in the vocational testimony is likely to erode the reliability of the basis for concluding the claimant is capable of doing other work that exists in significant numbers. The vocational expert testified generally that "knowledge base" is informed by nonpublic labor market surveys she has performed. While her testimony seemed to suggest she sometimes relies on labor market surveys particularly pertaining to certain occupations when testifying on the vocational requirements or job numbers, the testimony in this case does not seem to be affected this way. Despite questioning by the undersigned and the claimant's representative directly on this exact point, no information was elicited that suggested the testimony on the specific jobs and numbers identified at the hearing was affected in any way by the vocational expert's consideration of labor market surveys. These circumstances lead to the conclusion that the labor market surveys go to the vocational expert's general expertise, not her specific testimony in this case, and that the vocational expert found sufficient independent justification in the publicly available sources to conclude that jobs in the above occupations existed in the above estimated numbers, consistent with the above residual functional capacity. As the testimony on jobs and numbers in this case was not based on information from any specific labor market surveys, production of such materials is unlikely to affect the assessment of the reliability of the vocational expert's testimony. Accordingly, the subpoena request is denied.

The reliability of the vocational expert's methodology for determining the numbers of jobs is well established in the testimony. The vocational expert has professional knowledge and experience in job placement. Apart from the questions regarding the significance of the vocational expert's privately conducted labor market surveys, the vocational expert clearly elucidated her approach to estimating the number of jobs in existence in the above occupations based on publicly available information. The expert's sources and methods are not affected by questions of unreliability in this case. None of the claimant's representative's questioning presented an issue of misapplication of information or computational error. Accordingly, the vocational expert's job information is

found to be reliable.

(Tr. at 63-64.)

On June 19, 2018, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on this application. See Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019). This action followed.

## II. DISCUSSION

### A.   Standard of Review

The court will uphold an ALJ's final decision if the correct legal standards were applied and the conclusions are supported by "substantial evidence" in the record. L.D.R. v. Berryhill, 920 F.3d 1146, 1151 (7th Cir. 2019). Substantial evidence means such relevant evidence as a  reasonable mind might accept as adequate to support a conclusion. Id. at 1151-52. The court accordingly reviews the decision deferentially; it will not substitute its own judgment for that of the ALJ. Id. at 1152.

However, this does not mean the court will simply rubber-stamp the ALJ's decision without a critical review of the record.  Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015). Although the court will not re-weigh the evidence, it will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow the reviewing court to assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review.  Moore v. Colvin, 743 F.3d 1118, 1121 (7th Cir. 2014).

### B.   Plaintiff's Claims

#### 1.   Agency Consultant Opinions

As indicated above, the ALJ gave great weight to the agency medical consultants,

finding their opinions consistent with plaintiff's surgical history, as well as the diagnostic and treatment notes. He further noted: "Nothing in the evidence received at the hearing level is in particular conflict with their conclusions." (Tr. at 61.)

Plaintiff contends that after the state agency denied the claim—but prior to the hearing—his lawyer obtained and submitted new and material evidence (Pl.'s Br. at 4, citing Tr. at 353-57),[4] which he summarizes in his brief (Pl.'s Br. at 4-6). He then argues, relying on Moreno v. Berryhill, 882 F.3d 722, 729 (7th Cir. 2018) and Akin v. Berryhill, 887 F.3d 314, 317-18 (7th Cir. 2018), that this evidence, which the ALJ was not qualified to assess on his own, rendered the agency opinions obsolete. (Pl.'s Br. at 6-7.)

The basis for plaintiff's claim that the consultants at the reconsideration level lacked access to the evidence he cites in his brief, which comes from record exhibit 8F (Tr. at 457-516), is unclear. The "evidence of record" at the reconsideration level appears to include these notes (see Tr. at 118), although, it is true, the "reconsideration analysis" does not specifically cite the particular notes/dates plaintiff references (see Tr. at 121). In any event, even if the consultants lacked access to these particular treatment notes, plaintiff fails to develop his argument that the evidence "concerns neurological conditions beyond the ken of the ALJ." (Pl.'s Br. at 7.) The cited notes, from Dr. Soliven Bautista and a nurse practitioner at the pain management clinic plaintiff attended, contain essentially the same information as the other evidence from this provider. In virtually all of his notes, Dr. Bautista made the same observations: plaintiff suffered from chronic neck pain with limited range of cervical motion, but his strength was normal and he benefitted from pain medications, which allowed him to

---

[4]Transcript pages 353-57 correspond to plaintiff's brief to the Appeals Council. However, counsel made a similar argument in his pre-hearing brief to the ALJ. (Tr. at 344-50.)

19

function.  (E.g., Tr. at 486, 481, 471, 423.)[5]

The ALJ cited some of the pain management notes in support of his decision.  (Tr. at 60-61.)   Plaintiff's contention "that ALJs are not qualified to evaluate medical records themselves, but must rely on expert opinions," Moreno, 882 F.3d at 729, comes from a portion of the Moreno decision the Seventh Circuit later retracted on petition for rehearing.  The court "substitute[d] the following, more tailored language: 'That assessment was not justified under the circumstances of this case.'"  Moreno v. Berryhill, 2018 U.S. App. LEXIS 9296, at *2 (7th Cir. Apr. 13, 2018).[6]   Akin, the other case plaintiff cites, concerned the ALJ's flawed attempt to interpret an MRI report without expert medical assistance.  887 F.3d at 317-18.  Here, plaintiff cites no raw medical data the ALJ impermissibly interpreted.  Rather, his argument concerns medical notes in which a treating physician discussed plaintiff's condition.  Evaluating such evidence is what the ALJ is supposed to do.  See Thorps v. Astrue, 873 F. Supp. 2d 995, 1006

---

[5]I summarize the pain management notes in the appendix to this decision.  Plaintiff also discusses these notes in the context of his credibility argument (Pl.'s Br. at 12-14), but he fails to explain how they show the ALJ erred.  As the ALJ noted, plaintiff generally told Dr. Bautista that: "He is able to function with the help of pain medication." (Pl.'s Br. at 14.)  While this is not proof positive that plaintiff could hold down a full-time job, it does provide some support for the ALJ's conclusion.  Plaintiff complains that the ALJ failed to include a more restrictive hand use limitation, but he cites no specific medical evidence supporting such a restriction.  (Pl.'s Br. at 15, 19.) Plaintiff also faults the ALJ for not crediting his claimed exertional limitations (Pl.'s Br. at 19-20), but the ALJ explained that "the conservative and routine course of treatment, lack of clinical findings related to gait abnormality or lower back impairment, and some of the claimant's statements about the intensity of his symptoms and his functional level are inconsistent with the relatively extreme limitations the claimant alleges with respect to sitting, standing, and changing positions."  (Tr. at 61.)  Finally, plaintiff contends that his narcotic medications were ineffective and caused side effects (Pl.'s Br. at 21), but that is not what he told Dr. Bautista (Tr. at 60-61, 480, 471, 426, 422.)  In reply, plaintiff contends that the ALJ cherry picked from the record regarding his pain medications (Pl.'s Rep. Br. at 5), but based on my review, it appears plaintiff generally told Dr. Bautista his medications worked well without side effects.

[6]Plaintiff concedes his mistake in the reply brief.  (Pl.'s Rep. Br. at 2.)

(N.D. Ill. 2012) ("That's not playing doctor, that's weighing the evidence.").  Plaintiff cites no opinion evidence from Dr. Baustista or any other treating provider requiring greater physical limitations.  See Olsen v. Colvin, 551 Fed. Appx. 868, 874 (7th Cir. 2014) ("The cases in which we have concluded that an ALJ 'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment.").

### 2.    Plaintiff's Statements

Plaintiff next challenges the ALJ's evaluation of his statements about his pain and other symptoms.  (Pl.'s Br. at 7.)  In evaluating the credibility of a claimant's statements regarding his symptoms, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5.  Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9.  If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment he has received for relief of the pain or other symptoms.  Id. at *18-19. The court reviews an ALJ's credibility finding deferentially, reversing only if it "patently wrong." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019); Hall v. Berryhill, 906 F.3d 640, 644 (7th Cir. 2018).  While the ALJ must provide specific reasons for his finding, consistent with the regulatory factors and supported by the evidence, see, e.g., Shauger v. Astrue, 675 F.3d 690, 697-98 (7th Cir. 2012), he "need not specify which statements were not credible."  Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012).

Here, as indicated above, the ALJ acknowledged the required two-step evaluation process, finding that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. at 59.)  In support of this conclusion, the ALJ noted that the record, which documented clinical abnormalities including muscle spasm, restricted cervical range of motion, absent reflexes, weaker left grip strength, and decreased sensation, supported restriction to a range of light work with limitations to occasional climbing and frequent use of the hands.   However, he found further limitations unsupported, citing plaintiff's "conservative and routine" treatment during the relevant period; the consultative physical examiner's findings of intact strength, normal gait and station, and no abnormality of the lower back; and plaintiff's statements to providers that his symptoms were well controlled.  (Tr. at 60-61.)

Plaintiff first argues that the ALJ failed to establish that the medical evidence alone did not support the degree of limitation.  In support of this argument, he again notes that the ALJ failed to obtain an updated medical opinion, and again argues that the ALJ played doctor in reaching his conclusion.  (Pl.'s Br. at 9.)  As indicated above, plaintiff develops no argument that evidence received at the hearing level (or not otherwise seen by the agency consultants) rendered the consultants' opinions obsolete.  See Poyck v. Astrue, 414 Fed. Appx. 859, 861 (7th Cir. 2011) ("This court gives deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal.").

Plaintiff next argues that the ALJ relied only on medical evidence in making his

determination. (Pl.'s Br. at 9.)  That is also incorrect.  The ALJ considered plaintiff's statements regarding his symptoms and limitations, finding them inconsistent with his conservative treatment, clinical presentation, and his admissions to providers that medication controlled his pain and allowed him to function.  See Curvin v. Colvin, 778 F.3d 645, 651 (7th Cir. 2015) (affirming where the ALJ noted various inconsistencies between the claimant's alleged symptoms and the other evidence, including her admission that medication kept her condition under control).  Plaintiff faults the ALJ for failing to specify which allegations were credited and which were not (Pl.'s Br. at 10), but that is not required.  See Shideler, 688 F.3d at 312.

Plaintiff's argument that the ALJ erred in assessing his headaches gains more traction. (Pl.'s 10.)  In finding plaintiff's headaches non-severe, and then declining to include any related limitations in the RFC, the ALJ stated that no neurological work-up or treatment for headaches was undertaken, no headache-related clinical signs were observed at treatment visits, and the record suggests that the headaches were related to his neck/muscle spasms.  (Tr. at 56, 60.) The ALJ further opined that if plaintiff's "headaches were as debilitating as he alleges, more significant workup and treatment would be expected."  (Tr. at 61.)

While the record does not appear to contain neurological assessment of migraine headaches, plaintiff's providers regularly assessed "cervicogenic occipital headaches" and "occipital headaches."  (Tr. at 515, 508, 486, 427, 423, 398.)  They treated plaintiff's neck pain and headaches with strong narcotic medications.  It is unclear why the ALJ believed that more specific assessment and treatment would be required in order for this impairment to be accepted as one causing work-related limitations.  See Tyson v. Astrue, No. 08-cv-383-bbc, 2009 U.S. Dist. LEXIS 23069, at *27 (W.D. Wis. Mar. 20, 2009) (noting that while a claimant's self-reported symptoms are insufficient by themselves to establish disability, when these

23

symptoms are documented by a physician in a clinical setting they are, in fact, medical signs, and often the only means available to prove an impairment such as headache); see also Adaire v. Colvin, 778 F.3d 685, 687 (7th Cir. 2015) (noting that ALJs may not discount pain testimony that cannot be attributed to "objective" injuries or illnesses—the kind revealed by x-rays). The ALJ should on remand reconsider plaintiff's alleged limitations related to headaches. (Pl.'s Br. at 18; Tr. at 74-75.)[7]

I also agree with plaintiff that the ALJ erred in finding no severe mental impairment and including no mental limitations in his hypothetical questions and RFC. (Pl.'s Br. at 11, 16-17, 18-19.) As indicated above, the mental health professionals who evaluated plaintiff during the relevant time found severe mental impairments. The examining psychological consultant, Dr. Verwert, opined that due to his pain, poor memory, and depression, plaintiff "would have trouble in all areas." (Tr. at 395.)[8] The reviewing consultants, Drs. Lefevre and Stacey Fiore, endorsed moderate limitations in maintaining attention and concentration for extended periods, performing at a consistent pace without an unreasonable number of rest periods, and responding appropriately to changes in the work setting. (Tr. at 111-12, 127-28.)

The Commissioner notes that the ALJ was not required to accept these reports, as "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." (Def.'s Br. at 13, citing Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014).) However, rejecting or discounting the opinion of the agency's own physicians, "as happened here, can be expected to cause a reviewing court to take notice and await a good

---

[7]The Commissioner does not respond to this argument in his brief.

[8]The Commissioner notes various normal findings during Dr. Verwert's mental status exam (Def.'s Br. at 12), but he fails to grapple with the consultant's conclusions.

24

explanation for this unusual step." Beardsley v. Colvin, 758 F.3d 834, 839 (7th Cir. 2014); see also Wilder v. Chater, 64 F.3d 335, 337 (7th Cir. 1995) ("We are led to consider with a degree of suspicion the administrative law judge's decision to go against the only medical evidence in the case, that of a psychiatrist not retained by the applicant but appointed by the administrative law judge himself to advise on Wilder's condition."). No such explanation was provided in this case. The ALJ discounted Dr. Verwert's opinion because plaintiff received no mental health treatment during the relevant time, his opinion appeared to be based on the "subjective statements" by plaintiff and his wife, and he relied in part on plaintiff's physical impairments. (Tr. at 57-58.) The reviewers, in turn, relied on the examiner, so their opinions were similarly flawed.[9] (Tr. at 58.)

While the absence of mental health treatment is a factor the ALJ may consider, see, e.g., Denton v. Astrue, 596 F.3d 419, 423-24 (7th Cir. 2010), there is no requirement that a claimant receive contemporaneous treatment, which "would be a peculiarly unreasonable requirement in the case of depression, a notoriously underreported disease." Wilder v. Apfel, 153 F.3d 799, 802 (7th Cir. 1998). Indeed, plaintiff testified at the hearing that he was "in denial" about his depression and did not want to see a psychiatrist. (Tr. at 76.) He also told Dr. Verwert that his primary care physician did not want to prescribe anti-depressants due to worry about drug interactions with his pain medications. (Tr. at 392.) The ALJ failed to consider these explanations for the lack of treatment. See Craft v. Astrue, 539 F.3d 668, 679 (7th Cir. 2008) (holding that the ALJ must not draw any inferences about a claimant's condition

_____

[9]The ALJ also stated that the records obtained at the hearing level pertaining to the post-date last insured period are reflective of treatable, minimally impactful mental conditions. (Tr. at 58.) However, the ALJ provided little analysis of these records (which I summarize in the appendix), and the Commissioner does not defend the decision on this ground.

based on failure to seek treatment unless the ALJ has explored the claimant's explanations for the lack of medical care).

Nor was it improper for Dr. Verwert to rely on plaintiff's statements in reaching his conclusion. See Thompson v. Berryhill, 722 Fed. Appx. 573, 580-81 (7th Cir. 2018) ("The ALJ dismissed Dr. Link's report as 'not worthy of great weight' because it purportedly was based on Thompson's subjective complaints and was not 'independently verified.' But any psychological examination could be said to suffer from this criticism, and this statement ignores the professional status and judgment of the psychologist."); Price v. Colvin, 794 F.3d 836, 840 (7th Cir. 2015) ("[P]sychiatric assessments normally are based primarily on what the patient tells the psychiatrist, so that if the judge were correct, most psychiatric evidence would be totally excluded from social security disability proceedings[.]'").

Finally, while Dr. Verwert did referennce plaintiff's pain related to his physical impairments, it is unclear why Dr. Verwert would be unqualified to factor pain into his analysis of plaintiff's mental limitations. See Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective in the sense of being experienced in the brain."). In any event, Dr. Verwert also based his conclusions on plaintiff's depression and memory problems, subjects plainly within his area of expertise, and his evaluation included a mental status examination.

A finding that plaintiff has a severe mental impairment does not, of course, mean that he is disabled. The reviewing consultants indicated that plaintiff could still perform unskilled work. However, the matter must be remanded so that the ALJ can apprise the VE of all plaintiff's limitations, including any mental limitations. See Varga v. Colvin, 794 F.3d 809, 813-14 (7th Cir. 2015).

### III. CONCLUSION

As indicated above, because the matter must be remanded for other reasons, I need not decide whether the ALJ erred in refusing to order production of the VE's materials. However, I note that even after Biestek production of such materials remains "best practice." As the Seventh Circuit recently stated:

> We want to be clear that our holding today and that of Biestek do not give vocational experts carte blanche to testify without providing underlying sources. It is certainly best practice for vocational experts to provide underlying sources at hearings, and we encourage them to do so. See Biestek, 139 S. Ct. at 1155 (noting that a vocational expert's testimony would be "more reliable and probative" and "a best practice for the SSA and its experts" if the expert "produced supporting data"); see also Social Security Administration, Vocational Expert Handbook, 37 (Aug. 2017), https://www.ssa.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf ("You should have available, at the hearing, any vocational resource materials that you are likely to rely upon and should be able to thoroughly explain what resource materials you used and how you arrived at your opinions."). We will review on a case-by-case basis situations where a vocational expert does not produce his sources and the ALJ declines to require him to do so. In some cases, the vocational expert's testimony may prove to be unreliable without underlying sources, and in those cases the testimony may neither constitute substantial evidence nor be used as the basis for an ALJ's determination.

Krell, 931 F.3d at 587.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision under 42 U.S.C. § 405(g), sentence four. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of January, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge

**APPENDIX**

• **Pain management treatment records**

On March 16, 2013, plaintiff saw Dr. Soliven Bautista for chronic neck pain.  Dr. Bautista noted: "Patient's pain is fairly controlled.  He takes the dog out daily and tries to stay active. . . . Pain is moderate to severe and intermittently radiates to his shoulders and arms.  This is constant and is aggravated with certain neck and arm movement.  He feels that pain medications have been helpful in allowing him to function.  He denies adverse effects."  (Tr. at 514.)  On exam, plaintiff displayed moderately limited cervical range of motion ("ROM") but normal strength.  Dr. Bautista assessed chronic neck pain with bilateral cervical radiculopathy, occipital neuralgia improved after occipital nerve injection, and cervicogenic occipital headaches.  He continued plaintiff on Oxycontin, Percocet, and Gabapentin.  (Tr. at 515.)

On May 29, 2013, plaintiff returned to Dr. Bautista for chronic neck and bilateral arm pain.  "Patient states he has not been able to sleep well due to pain.  He presently rates 8/10 pain that shoots down both arms from the neck.  He has a history of cervical fusion.  Pain is constant and aggravated with any activity."  (Tr. at 507.)  On exam, he displayed moderately limited cervical spine ROM but normal strength and gait.  The doctor assessed chronic neck pain with bilateral cervical radiculopathy, occipital neuralgia improved after occipital nerve injection, and cervicogenic occipital headaches.  He continued Oxycontin and Percocet, but changed Gabapentin to Lyrica.  (Tr. at 508.)

On September 18, 2013, plaintiff saw Terry Zacharias, NP, for chronic neck pain.  "He reports that he has not been too bad.  The weather had been tough on him.  He has pain at the base of the skull.  He has numbness in the hands left greater than right.  He has pain down

28

the posterior arms.  He rates his pain as an 8 on a scale of 1 to 10 . . . . His medications are working for him."  (Tr. at 500.)  On exam, he displayed decreased neck range of motion but normal shoulder strength.  (Tr. at 501.)  He continued on Oxycontin and Percocet.  (Tr. at 502.)

On November 27, 2013, plaintiff saw Dr. Bautista for chronic neck pain.  "Patient reports that his pain is fairly controlled with oxycontin and Percocet. . . . He currently rates his pain at 7/10 and involves the neck with pain radiating down both arms.  Pain is constant and aggravated by cold temperature.  He denies adverse effects from his pain medicines."  (Tr. at 496.)  On exam, he showed moderately limited cervical ROM but normal strength.  Dr. Bautista continued Oxycontin and Percocet.  (Tr. at 497.)

On February 26, 2014, plaintiff saw Dr. Bautista for chronic severe neck pain.  "Patient reports that pain is well controlled with medications.  He currently rates his pain at 3/10 with intermittent radiation to both arms.  He denies constipation.  He is able to function well with the help of medications.  At times he would have occipital headaches."  (Tr. at 486.)  On exam, he displayed moderately limited cervical ROM but normal strength.  He continued on Oxycontin and Percocet.  (Tr. at 487.)

On May 21, 2014, plaintiff saw Dr. Bautista for chronic neck pain and bilateral arm pain.  "Patient reports good pain control.  He rates his pain at 4/10.  He has constant pain with paresthesias in his fingers.  He is able to function well and sleep fairly well.  He denies adverse effects from oxycodone. . . . Patient is currently unemployed and plans to apply for social security disability.  He was evaluated for vocational rehab but still unable to find a job."  (Tr. at 480.)  On exam, he displayed moderately limited cervical ROM but normal strength.  "He is benefitting from pain medications which allow him to function."  (Tr. at 481.)

On August 13, 2014, plaintiff saw Dr. Bautista for "chronic severe neck pain that is

alleviated with pain medications. He reports neck spasms. He was responding to Lyrica but his insurance stopped covering this. . . . He presently rates his pain at 6/10 with pain from the neck radiating down both legs. [sic?] He has good days and bad days. He is not able to find employment at this time but plans to help with his father's auto body shop. He is able to function with the help of pain medications. He denies adverse effects or constipation." (Tr. at 471.) On exam, he had moderately limited cervical ROM but normal strength. "He is benefitting from pain medications which allow him to function." The doctor continued Oxycontin and Percocet. (Tr. at 472.)

On November 13, 2014, plaintiff saw NP Zacharias for chronic neck pain with peripheral neuropathy, bilateral upper extremities. He reported that he did some light moving of things the previous day and had a lot of arm and hand pain. (Tr. at 466.) He was to continue on Oxycontin and Percocet, and follow up with Dr. Bautista in two months. (Tr. at 468.)

On January 14, 2015, plaintiff saw Dr. Bautista for chronic severe neck pain. "Patient reports good pain control with his medications. He has neck pain that radiates to both upper limbs and to the back of his head. He had failed to respond to cervical ESI before and after his neck surgery. He is currently unemployed but is able to stay active at home with the help of pain medications. He denies adverse effects or constipation. He presently rates his pain at 3/10." (Tr. at 426.) Dr. Bautista assessed chronic neck pain with bilateral cervical radiculopathy, and occipital neuralgia with occipital headaches. He ordered Lyrica and continued Oxycontin and Percocet. (Tr. at 427.)

On March 11, 2015, plaintiff saw Dr. Bautista for chronic severe neck pain. "Patient reports that his pain medications are working well without adverse effects. He rates his pain today at 3/10. Neck pain is localized, constant, and aggravated with any activity. His insurance

30

did not cover Lyrica. He is presently unemployed and is applying for disability." (Tr. at 422.) On exam, he had moderately limited cervical ROM but normal strength. The doctor assessed chronic neck pain with bilateral cervical radiculopathy and occipital neuralgia with occipital headaches. "He is able to function with the help of pain medications." They discussed reducing Percocet. (Tr. at 423.)

On May 6, 2015, plaintiff returned to Dr. Bautista for chronic severe neck pain. "Patient reports fair pain control in the neck. He has radicular pain in both arms. He rates the pain today at 4/10 and denies adverse effects from his pain medicines. He tried reducing the amount of Percocet a day but that was not able to control his pain. He has not been able to sleep well for a while and does not have the energy for activities although he walks his dogs regularly. He says that he is also feeling depressed due to lack of ability to perform more activities." (Tr. at 418-19.) Dr. Bautista continued Oxycontin and Percocet, and ordered Ambien for insomnia. (Tr. at 419.)

On July 1, 2015, plaintiff saw Dr. Bautista for chronic neck pain. "Patient reports that neck pain is well controlled with medications. He denies adverse effects or constipation. He rates his pain today at 2/10. He is able to walk regularly and stay active. He reports localized neck pain but has paresthesias in his fingers bilaterally. He is able to sleep well with Ambien." (Tr at 414-15.) "He is able to function with the help of pain medications." (Tr. at 415.)

On August 26, 2015, plaintiff saw Dr. Bautista for "chronic neck pain with paresthesias in both hands. He reports no radicular pain at this time. He reports that his pain medications are working well. He rates his pain today at 3/10. He denies constipation." (Tr. at 410.) On exam, he had moderately limited cervical ROM with normal strength and gait. Oxycontin and Percocet were continued. "He is able to function with the help of pain medications." (Tr. at

411.)

On October 26, 2015, Dr. Bautista wrote: "The patient has chronic severe neck pain that radiates to both upper limbs.  He is able to function well with the help of pain medications.  He denies adverse effects or constipation.  He rates his pain today at 3/10."  (Tr. at 406.)  He had limited cervical ROM but normal strength.  "He is able to function with the help of pain medications."  (Tr. at 407.)

On January 6, 2016, Dr. Bautista noted: "Pain control is good and he denies adverse effects from his pain medication."  (Tr. at 402.)  "He is able to function with the help of pain medications."  (Tr. at 403.)  On March 2, 2016, Dr. Bautista again noted chronic neck pain and occipital headaches; limited cervical ROM; and continued Oxycontin and Percocet.  (Tr. at 398.)

On July 26, 2016, plaintiff was discharged from the pain clinic due to alcohol use.  (Tr. at 609.)

• **Mental Health/Alcohol Abuse Records**

In January 2015, plaintiff was hospitalized for acute alcohol withdrawal.  On January 11, 2015, he followed up with Dr. Mark Meler, doing fine at home, without alcohol.  (Tr. at 434.)

On June 6, 2016, plaintiff went to the ER and was admitted related to alcohol addiction and narcotic withdrawal.  (Tr. at 529, 542.)  He discharged on June 10, 2016.  (Tr. at 546.)  He went to the ER again on July 19, 2016.  (Tr. at 547.)  At that time, it was recommended he pursue out-patient follow up.  (Tr. at 552.)

On August 17, 2016, he went to the ER for syncope/fainting (Tr. at 554, 561) and was admitted.  (Tr. at 560.)  He discharged on August 19, 2016 (Tr. at 565) with a diagnosis of alcohol withdrawal (Tr. at 566).

On September 1, 2016, plaintiff was seen for a psychiatric evaluation. He reported being sober, and that Zoloft was helping his mood. (Tr. at 694.) He was diagnosed with major depressive disorder, mild, and alcohol use disorder, severe, in early remission. Zoloft was increased. (Tr. at 698.)

On December 6, 2016, plaintiff reported that he was still depressed but overall feeling better. He was still in a lot of pain. (Tr. at 712.) He was diagnosed with major depressive disorder, moderate, alcohol use disorder, severe, in early remission. The doctor increased Zoloft and started Trazodone. (Tr. at 715.)

On September 23, 2016, plaintiff restarted on pain medications with a primary care provider. (Tr. at 617-18.)

On January 27, 2017, plaintiff went to the ER with weakness and instability, and was admitted for evaluation and management. Providers diagnosed chronic alcoholism. (Tr. at 569, 582.)

On March 6, 2017, at a psychiatric follow up, plaintiff reported improved mood, still depressed at times, but overall fewer episodes. Medications were helping his anxiety. (Tr. at 725.) He continued on Valium, with increased Zoloft and Trazodone. (Tr. at 728.)

In March, April, and May 2017, the primary provider continued pain medications. (Tr. at 635, 645, 657.)

At an August 15, 2017, psychiatric follow up, plaintiff was diagnosed with major depressive disorder, moderate; anxiety disorder, NOS; and alcohol use disorder, severe, in early remission. The doctor started Abilify, and continued Valium, Zoloft, and Trazodone. (Tr. at 755.)